

FILED & ENTERED

NOV 01 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY sumlin    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br>Seyed Mustafa Maghloubi,<br><br>                          Debtor. | Case No.:   2:23-bk-13307-NB<br>Chapter:    11<br><br>**MEMORANDUM DECISION FOR COERCIVE INCARCERATION OF SEYED MUSTAFA MAGHLOUBI**<br><br><u>Pre-Evidentiary Hearings on OSCs</u>:<br>Dates: January 23, February 20, March 12, April 9, April 23, and August 8, 2024<br><br><u>Evidentiary Hearings on OSCs</u>:<br>Dates: August 23, September 11, October 10, and October 29, 2024<br><br><u>Continued Evidentiary Hearing on OSCs</u>:<br>Date:  December 10, 2024<br>Time:  3:00 p.m.<br>Place: Courtroom 1545<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

    On December 11, 2023, this Court issued an order directing the above-captioned Debtor ("Mr. Maghloubi") to appear and show cause why this Court should not impose sanctions and/or direct the appointment of a chapter 11 trustee (dkt. 60, the "Initial

OSC"). As set forth in the caption above, this Court has conducted ten hearings on the Initial OSC and subsequent OSCs, including four evidentiary hearings.

Unfortunately, although Mr. Maghloubi has been provided multiple opportunities over a period of approximately eleven months to comply with his obligations under this Court's orders and under the Bankruptcy Code, he has chosen not to do so. This Court is reluctantly forced to find and conclude that coercive incarceration is necessary to compel Mr. Maghloubi's compliance with those obligations.

This Memorandum Decision summarizes and memorializes some of the principal oral findings of fact and conclusions of law made by this Court at the ten hearings held in connection with the OSC, as permitted by Rule 52(a) (Fed. R. Civ. P.), made applicable by Rules 7052 and 9014(c) (Fed. R. Bankr. P.). All of this Court's oral findings and conclusions are deemed to be incorporated herein.

**1. Legal standards**

This Bankruptcy Court derives its civil contempt authority from 11 U.S.C. § 105(a), which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. [11 U.S.C. § 105(a).]

This court may hold a party in civil contempt if there is "clear and convincing evidence that the contemnor[] violated a specific and definite order of the court." *In re Dyer*, 322 F.3d 1178, 1191 (9th Cir. 2003); *see also Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) ("Civil contempt … consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."). A party may be held in contempt for violating a court order only if there is "*no fair ground of doubt* as to whether" the party's acts or omissions violated the order. *Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019) (emphasis in

original). Stated another way, "civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the [party's] conduct might be lawful." *Id.* Although inability to comply is a defense to a charge of civil contempt, the "party asserting the impossibility defense must show 'categorically and in detail' why he is unable to comply." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1241 (9th Cir. 1999) (citation omitted).

For contempt purposes, a "specific and definite order of the court," *Dyer*, 322 F.3d 1178, 1191, can consist either of a judicial decree that has been tailored to the unique circumstances of a particular case, or alternatively what is known as a "deemed order" – that is, an obligation arising by operation of law to take (or refrain from taking) various actions. The filing of a bankruptcy petition triggers multiple such "deemed orders," including, for example, the automatic stay of 11 U.S.C. § 362(a). *See Dyer*, 322 F.3d 1178, 1191 ("Because the 'metes and bounds of the automatic stay are provided by statute and systematically applied to all cases,' there can be no doubt that the automatic stay qualifies as a specific and definite court order.") (citation omitted). The obligations imposed upon chapter 11 debtors upon entry of an order for relief – including the duties to file complete and accurate schedules and to provide various financial, management, and operational reports to this Court and the United States Trustee ("UST") – are another example of such "deemed orders."

Incarceration is an appropriate coercive sanction for civil contempt provided "the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order." *Hicks v. Feiock*, 485 U.S. 624, 635 n. 7. "When the petitioners carry 'the keys of their prison in their own pockets,' the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" *Shillitani v. United States*, 384 U.S. 364, 368 (1966) (citations omitted).

**2. The Initial OSC**

The Initial OSC itemized some of Mr. Maghloubi's failures to adhere to orders of this Court (both written orders tailored to this case and "deemed orders" imposing upon Mr. Maghloubi various obligations under the Bankruptcy Code):

> A) On October 13, 2023, this Court issued a Procedures Order (dkt. 32) which, among other things, required Debtor to appear at a Principal Status Conference to be conducted on November 14, 2023. Debtor failed to appear at the Principal Status Conference.
> B) Debtor failed to appear at both the Initial Debtor Interview and the initial § 341(a) meeting of creditors.
> C) After entry of the Order for Relief (dkt. 11), Debtor failed to file any of the lists, schedules, statements, and other documents required by Rule 1007 (Fed. R. Bank. P.).
> D) Debtor has failed to provide to the United States Trustee (the "UST") **any** of the financial, management, and operational reports that are necessary to enable the UST to carry out its oversight responsibilities under 28 U.S.C. § 586. *See* dkt. 42 at p. 4 (UST Motion to Dismiss). [Initial OSC (dkt. 60) at 1:27–2:11.]

**3. The five interim orders; their cautions to Mr. Maghloubi about possible incarceration; his settlement; and his breach of the settlement terms**

At a hearing on the Initial OSC held on January 23, 2024, this Court determined that Mr. Maghloubi had fallen far short of complying with this Court's orders and his obligations under the Bankruptcy Code.[1] On January 26, 2024, this Court issued an interim order that, among other things, imposed sanctions of $1,000.00 against Mr. Maghloubi and set a deadline for him to file amended bankruptcy schedules (dkt. 89, the "First Interim Order"). This Court took pains to emphasize that the small dollar amount of the sanctions did not mean that Mr. Maghloubi's omissions were not serious, but instead reflected only this Court's desire to avoid harming creditors:

> In setting the dollar amount of this sanction, this Court has taken into consideration (along with all the other facts and circumstances) that (i) the OSC warned Mr. Maghloubi that he might face a punitive sanction of

---

[1] As noted in ¶ 1, above, each instance of Mr. Maghloubi's failure to adhere to an obligation imposed upon him by the Bankruptcy Code amounts to a violation of a "deemed order" of this Court. For ease of reference, this Memorandum Decision at times refers to Mr. Maghloubi's non-compliance with his Bankruptcy Code obligations without always emphasizing that such non-compliance is also a violation of this Court's "specific and definite" orders.

-4-

> up to $2,000.00; (ii) Mr. Maghloubi has not denied his past misconduct described in the OSC, and he did not respond regarding the dollar amount; and (iii) most importantly, a more substantial dollar amount could harm creditors by taking funds that might otherwise go to them (*i.e.,* although Mr. Maghloubi's misconduct probably warrants a larger dollar amount of sanctions, imposing a larger amount might be counterproductive).
> 
> Mr. Maghloubi is strongly cautioned that he has a duty to prepare bankruptcy schedules and other papers accurately, and that when misstatements are frequent they look more and more like intentional acts and omissions to "hide the ball," or "shift the costs" to creditors to uncover the truth, or otherwise make improper use of the legal system. In addition, the longer Mr. Maghloubi fails to devote sufficient attention to this case, or attempts to mislead creditors (or this Court) by misstatements or omissions, the more he will risk much more serious sanctions….
> 
> In sum, Mr. Maghloubi's past wrongful acts and omissions have not been *excused*; he cannot "unring the bell"; his very belated bankruptcy schedules have not been prepared accurately enough; he might be subject to additional sanctions or remedies for his acts and omissions to date; and the $1,000.00 punitive sanction is in no way intended to be full compensation to this Court for Mr. Maghloubi's harm to the administration of justice, let alone any compensation to creditors including Mr. Totaro. [First Interim Order (dkt. 89) at pp. 6–8.]

The First Interim Order (dkt. 89) order also set a continued hearing on the Initial OSC.

At the continued hearing this Court determined that the amended schedules were still patently deficient, and that there were numerous other problems such as Mr. Maghloubi's failure to appear for his Initial Debtor Interview. On February 22, 2024, this Court issued an order (dkt. 97, the "Second Interim Order") detailing these things and imposing additional relief in connection with the OSC by directing UST to appoint a chapter 11 trustee. Dkt. 97. On that same date, UST appointed Todd A. Frealy as the chapter 11 trustee (*see* dkt. 98) and on February 23, 2024, this Court entered an order approving the appointment of Mr. Frealy ("Trustee"). *See* dkt. 101.

On March 14, 2024, this Court entered a further interim order (dkt. 120, the "Third Interim Order") describing Mr. Maghloubi's continuing non-compliance with his obligations under the Bankruptcy Code, which included "(A) failure to file any monthly operating reports ('MORs'); (B) failure to meet a 2/27/24 deadline to file an Amended Schedule I containing a proper response to question 8a (which inquires about 'net

income from rental property and from operating a business, profession, or farm,' and requires Mr. Maghloubi to '[a]ttach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income'); and (C) failure to appear at status conferences as directed by this Court." Third Interim Order (dkt. 120) at p. 4.  Mr. Maghloubi's failure to comply with the Second Interim Order's (dkt. 97, p. 6) deadline to file an Amended Schedule I that properly accounted for the operation of his business was of particular concern to this Court, given that the business had generated substantial income in the past.  The Third Interim Order warned Mr. Maghloubi that "possible sanctions could include evidentiary presumptions and/or **coercive incarceration**," among other things.  Third Interim Order (dkt. 120) at p. 4 (emphasis added).

On April 15, 2024, this Court entered an order setting an evidentiary hearing on the Initial OSC and the additional matters set forth in the interim orders.  *See* dkt. 141 (the "Fourth Interim Order" or, with the Initial OSC and the other Interim Orders, the "OSCs"). That Fourth Interim Order required Mr. Maghloubi to appear and "testify as to the reasons for **all** of his failures to comply with his obligations under the Bankruptcy Code and this Court's orders …."  (Emphasis in original.)  It also reiterated this Court's prior warning to Mr. Maghloubi, once again cautioning him that "possible sanctions could include evidentiary presumptions and/or coercive *incarceration*."  *Id.* at p. 5 (emphasis added).

On the same day (April 15, 2024) – approximately one week prior to the first scheduled date for the evidentiary hearing – Mr. Maghloubi's counsel, Tony Forberg, Esq., filed a "Substitution of Attorney" (dkt. 144) stating that Mr. Forberg no longer represented Mr. Maghloubi and that Mr. Maghloubi was now proceeding *in pro se*.

Mr. Maghloubi appeared at the first scheduled date for the evidentiary hearing and requested a continuance so that he would have the opportunity to retain new counsel.  Mr. Maghloubi's request for a continuance was not opposed by either Trustee or Michael Totaro, Esq. a creditor who has been participating in these proceedings (and

a debtor in his own bankruptcy case, no. 2:23-bk-11397-NB).[2]  This Court orally granted the request for a continuance.

On June 11, 2024, this Court entered an order (dkt. 151, the "Fifth Interim Order") approving a stipulation (dkt. 150) among Trustee, Mr. Maghloubi, and Mr. Totaro for a second continuance of the evidentiary hearing.  Entry of that order was based upon the representation that, with Trustee's assistance, Mr. Maghloubi and Mr. Totaro had reached a settlement of the Damages Action and the Dischargeability Action (both as defined in note 2).

On June 14, 2024, this Court entered orders approving a written settlement of the Damages Action and Dischargeability Action, under which Mr. Maghloubi and his spouse agreed to pay $135,000.00 over a period of thirteen months to resolve both actions.  *See* Damages Action dkt. 22 and Dischargeability Action dkt. 16 (the "Settlement Orders").  On July 26 and July 30, 2024, Mr. Totaro filed papers alleging that Mr. Maghloubi had defaulted under the settlements by his late and missed payments.  *See* Damages Action dkt. 25 and Dischargeability Action dkt. 19.

**4. The first evidentiary hearing; and Mr. Maghloubi's blatant lies**

On August 8, 2024, Mr. Maghloubi, Mr. Totaro, and Trustee appeared at the third continued date for the evidentiary hearing.  No testimony from Mr. Maghloubi was taken, however, because Mr. Maghloubi appeared *pro se* and both Mr. Totaro and Mr. Maghloubi requested that a further continued evidentiary hearing be scheduled to provide Mr. Maghloubi an opportunity to retain new counsel.

On August 12, 2024, this Court entered an order setting a fourth and final continued date for the initial evidentiary hearing on the OSCs.  *See* dkt. 154 (the "Final Continuance Order").  As provided in the Final Continuance Order, this Court conducted

---

[2] Specifically, Mr. Totaro has sought and supported the OSCs and has filed (1) an action for damages against Mr. Maghloubi (Adv. No. 2:23-ap-01155-NB, the "Damages Action") and (2) an action seeking a determination that the indebtedness alleged in the Damages Action is non-dischargeable as to Mr. Maghloubi (Adv. No. 2:24-ap-01007-NB, the "Dischargeability Action").  This Court has entered an order procedurally consolidating the Damages Action and the Dischargeability Action for purposes of trial.  *See* Damages Action dkt. 18.

-7-

the first evidentiary hearing on August 23, 2024, and heard testimony from Mr. Maghloubi, who was now represented by new counsel, Darius Shahrouzi, Esq.

The evidence at that hearing established that key assertions made by Mr. Maghloubi prior to that hearing had been blatantly false.

**a. Operating a business that allegedly had been shut down**

Mr. Maghloubi repeatedly represented that he has no money to pay creditors because his auto repair business has been shut down (as a result of permitting violations). Video evidence introduced by Mr. Totaro showed that, contrary to Mr. Maghloubi's assertions, he is still operating that business.

The video shows a private investigator approaching Mr. Maghloubi to obtain a quote to repair a damaged vehicle. Mr. Maghloubi states that he can repair the vehicle and submit an insurance claim.

Further damaging his credibility, Mr. Maghloubi suggests in the video that the investigator cooperate with him in what appears to be an insurance fraud scheme. Mr. Maghloubi proposes to submit an inflated claim for repairs that would not be performed and to then split the excess insurance proceeds with the investigator.

The fact that the business has been operating was later corroborated by documentary evidence, and was eventually admitted by Mr. Maghloubi. Specifically, after this Court issued an order finding him in contempt of court (dkt. 156), Mr. Maghloubi turned over to Trustee a partial set of records pertaining to the operation of his auto repair business. Trustee's Decl. (dkt. 181) at ¶¶ 3–10 (pp. 2:18–4:13). Although those records have significant time gaps, they show that, at a minimum, his business has generated income of $214,997.52 after conversion of this case to Chapter 11. Trustee's Decl. (dkt. 181) at ¶ 7 (p. 3:25–27). Mr. Maghloubi also filed a declaration in which he belatedly acknowledged that his business had continued to operate. Maghloubi Decl. (dkt. 178) at ¶¶ 5–18 (p. 3–5).

**b. Staging a theft of business records**

For many months Mr. Maghloubi has asserted that he could not turn over documents and records because they had been stolen, and most of his financial transactions are in cash, so he cannot recreate his stolen records from other sources. His attempts to provide evidence of that theft were completely unbelievable, and those attempts only reinforced this Court's findings that he is not a credible witness.

According to Mr. Maghloubi, he stores all business records in his vehicle and thieves broke into his vehicle and stole the records. To substantiate these allegations Mr. Maghloubi stated that he had videos, taken from security cameras in the garage where he parks his car, showing the thieves in action.

Before watching the videos this Court anticipated that they would show the alleged thieves in ski masks (or other means of concealment), quickly looking in the windows of numerous cars, spotting a laptop computer in Mr. Maghloubi's car, breaking the car window or otherwise forcibly gaining entry, stealing the computer, and running away. This Court anticipated that Mr. Maghloubi would testify that he kept all of his business records on that computer, without backing them up. That story might have had at least a veneer of plausibility.

Instead, the video footage shows two men, without any masks or other concealment, one wearing a bright orange-colored vest, leisurely walking into a well-lighted parking garage and approaching a four-door white hatchback. The portion of the video showing how the men opened the vehicle's rear liftgate is missing, and there are no telltale signs of forced entry, such as damage to the vehicle.

The videos are best viewed multiple times because one is backward and the other is sped up, but slowed down to ¼ speed the fast video shows the following. The two men are "stealing" paper files. They are also selecting which papers they will take, although without looking closely – *i.e.,* as if they already

know what to look for (some bags or boxes are passed over apparently without being opened, and other file folders, papers, and a bag are handed from one man to the other to hold and take away).  Then they close the hatchback before walking away.

Mr. Maghloubi apparently realized, belatedly, how implausible this scenario would be, because he testified that he must have been set up.  To reinforce this new story he testified that his jacket and wallet were in the car but were not stolen, making the "theft" all the more suspicious.

As this Court stated on the record, Mr. Maghloubi's change of story was no more credible than his initial story.  For example, how would Mr. Totaro, or anyone else purportedly trying to set him up, know that he kept his records in his car?  How would they know that such records were (allegedly) the only copy, and therefore worth stealing?  Etc.

In sum, this Court was no more persuaded by Mr. Maghloubi's excuses for not producing documents and records than by his assertions that he was not operating his car repair business.  This Court found that he was blatantly lying.

**5. The First Contempt Order, and further warnings to Mr. Maghloubi about likely incarceration**

On August 28, 2024, this Court entered an order holding Mr. Maghloubi in contempt (dkt. 156, the "First Contempt Order").  The First Contempt Order set a deadline of September 9, 2024 for Mr. Maghloubi (x) to file corrected and missing documents, (y) to provide non-filed documents, and (z) to turn over books, records, and assets to Trustee.  First Contempt Order (dkt. 156) at ¶ 2 (p. 2:10–3:3).  It also cautioned Mr. Maghloubi that "he will face sanctions, ***very likely including coercive incarceration,*** if he does not persuade this Court that he has fully complied" with the directive to produce documents and records and turn over assets.  First Contempt Order (dkt. 156) at ¶ 4 (p. 3:11–13) (emphasis added).

Further emphasizing the importance of complete disclosure and turnover of all assets, books, and records, the First Contempt Order stated that "to avoid *incarceration* or other sanctions, Mr. Maghloubi is strongly encouraged, if he has any doubts about what to disclose or turn over, to choose to disclose and turn over as much as possible." First Contempt Order (dkt. 156) at ¶ 4 (p. 3:18–20) (emphasis added). Finally, the First Contempt Order set a continued evidentiary hearing to "make a very preliminary assessment of whether Mr. Maghloubi has complied with the [First Contempt Order's] disclosure and turnover requirements." First Contempt Order (dkt. 156) at ¶ 3 (p. 3:5–7).

**6. The continued evidentiary hearing and the Second Contempt Order**

On September 11, 2024, this Court conducted a continued evidentiary hearing to assess Mr. Maghloubi's compliance with the First Contempt Order, at which it took additional testimony from Mr. Maghloubi. In an order issued on September 12, 2024 (dkt. 176, the "Second Contempt Order"), this Court memorialized some oral findings of fact and conclusions of law made at that hearing. Specifically, this Court determined that Mr. Maghloubi had not complied with the First Contempt Order, because among other omissions he had failed to produce complete business records or turn over assets. *See* Second Contempt Order (dkt. 176) at ¶ 1 (p. 2:11–3:10).

Without excusing Mr. Maghloubi's non-compliance, this Court set a renewed deadline of September 26, 2024 for Mr. Maghloubi to fully comply with the First Contempt Order. This Court also advised Mr. Maghloubi that if he failed to meet that deadline, "he **will be** subject to coercive *incarceration*." Second Contempt Order (dkt. 176) at ¶ 2 (p. 3:11–12) (emphasis added).

**7. The further continued hearings**

On October 10, 2024, this Court conducted a further continued hearing to ascertain whether Mr. Maghloubi had complied with the First and Second Contempt Orders (dkt. 156 & 176). But Mr. Maghloubi's counsel, Mr. Shahrouzi, appeared via video transmission and requested that the hearing be continued because he was

-11-

hospitalized overseas.  While expressing serious concerns about further delay, this Court granted a continuance upon a determination that the seriousness of potential incarceration outweighed those concerns.

On October 29, 2024, this Court conducted a continued evidentiary hearing at which Mr. Maghloubi testified.  At that hearing, this Court orally ruled that Mr. Maghloubi has failed to meaningfully comply with the First and Second Contempt Orders (dkt. 156 & 176) for the following two independent reasons: failure to produce documents, records, and information; and failure to turn over assets.

### a. Failure to produce documents, records, and information

Mr. Maghloubi has failed to disclose the income generated by his auto repair business and how he has spent that income.  A spreadsheet introduced into evidence by Trustee shows material discrepancies between the alleged revenues reported in Mr. Maghloubi's Monthly Operating Reports ("MORs") and the cash balances reported on the incomplete bank account records that Mr. Maghloubi has produced to Trustee.  These discrepancies, and bank records previously introduced in evidence showing large cash deposits whenever needed by Mr. Maghloubi, have persuaded this Court that Mr. Maghloubi has diverted and retains very substantial funds.  This is all further corroborated by the fact that even the incomplete bank account records that Mr. Maghloubi has produced contain a significant number of large cash transactions which Mr. Maghloubi has failed to adequately explain.  In sum, Mr. Maghloubi has not remotely provided the sort of documents, records, information, and accounting that he would need to provide before he could persuade this Court that, notwithstanding his prior repeated lies, he has now provided an accurate picture of his finances, and that he is unable to pay his creditors out of the very large sums he has failed to account for.

### b. Failure to turn over assets and income

Mr. Maghloubi still has failed to turn over any substantial assets or income to Trustee.  Mr. Maghloubi's offer at the hearing to turn over to Trustee "the keys" to his auto repair business is illusory.  The auto repair business is a sole proprietorship that

has little if any value without Mr. Maghloubi. The income generated by the auto repair business is the asset that Mr. Maghloubi should have turned over.

**8. Conclusion**

For all of the foregoing reasons, this Court finds and concludes that Mr. Maghloubi continues to be in violation of this Court's orders – both written orders tailored to the particular circumstances of this case, such as the First and Second Contempt Order (dkt. 156 & 176), and "deemed orders" imposing upon Mr. Maghloubi various obligations under the Bankruptcy Code (see ¶ 1, above). Notwithstanding the ample time and multiple opportunities that Mr. Maghloubi has been provided to rectify the situation, he remains in contempt of court. This Court is compelled to determine that coercive incarceration is necessary to secure Mr. Maghloubi's compliance with its orders. Concurrent with this Memorandum Decision, a separate judgment and commitment order will be issued directing Mr. Maghloubi to surrender himself to the U.S. Marshal's Service to be detained in the custody of the Bureau of Prisons.

###

Date: November 1, 2024

Neil W. Bason
United States Bankruptcy Judge